IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MILLIS DEVELOPMENT & CONSTRUCTION, INC. and MT. HAWLEY INSURANCE COMPANY, <br><br>     Plaintiffs, <br><br> v. <br><br> AMERICA FIRST LLOYD'S INSURANCE COMPANY, <br><br>     Defendant. | CIVIL ACTION NO. H-10-3260 |

## <u>MEMORANDUM OPINION</u>

Pending before the court[1] are Defendant's Motion for Partial Summary Judgment (Doc. 11) and Plaintiff's Motion for Partial Summary Judgment (Doc. 21). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment, and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Partial Summary Judgment.

## I.  Background

Mt. Hawley Insurance Company ("Mt. Hawley" or "Plaintiff") brought this action against America First Lloyd's Insurance Company ("America First" or "Defendant") seeking a declaratory judgment on the coverage obligations allegedly owed by America First to Millis Development and Construction, Inc. ("Millis") and Trendmaker Homes, Inc. ("Trendmaker") as defendants in a personal injury lawsuit

---

[1]      The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Doc. 16 & 27.

pending in Harris County (the "Underlying Action"). [2] Defendant filed its motion for summary partial judgment seeking the following declarations: (1) that it owed no duty to defend Trendmaker in the Underlying Action; (2) that its duty to defend Millis began with the filing of the sixth amended petition in the Underlying Action; and (3) that it had pro rata liability with Mt. Hawley for the costs incurred in defending Millis in the Underlying Action.[3]

In response, Plaintiff moved to amend its complaint and filed its second amended complaint on June 13, 2011.[4] Plaintiff then filed its motion for partial summary judgment seeking the following declarations from the court: (1) that both Millis and Trendmaker are additional insureds on the America First policy; (2) that America First's duty to defend Millis and Trendmaker was triggered by the filing of the original petition in the Underlying Action; (3) that America First owes primary and non-contributory coverage to Millis and that Mt. Hawley provides excess coverage for Millis; (4) that America First has a duty to pay its pro rata share of defense and indemnity costs incurred on behalf of Trendmaker.[5] Plaintiff also seeks summary judgment on its breach of contract claims against America First and alleges that America First breached its insurance contract to defend and indemnify both Millis

---

[2]   See Doc. 20, Pl's 2d Am. Compl., p. 2.

[3]   See Doc. 11, Def's Mot. for Partial Summ. J., p. 3.

[4]   See Doc. 20, Pls.' 2d Am. Compl., p. 1-14. Millis brings an additional breach of contract claim against America First in this complaint. Mt. Hawley also added other claims in this complaint, which are not addressed by the court at this time.

[5]   See Doc. 21, Pls.' Mot. for Partial Summ. J. & Br. in Supp., p. 9-25.

and Trendmaker in the Underlying Action.[6] Plaintiff claims that because of America First's alleged breaches of contract, Plaintiff is entitled through contractual and equitable subrogation to recover defense and indemnity costs expended on behalf of Millis and Trendmaker in the Underlying Action as well as other costs and attorney's fees in bringing this action.[7]

## A. **The Underlying Action**

In September 2009, Wayne Gordon ("Gordon"), the plaintiff in the Underlying Action, filed his original petition.[8] Gordon alleged that he was injured on February 2, 2009, in the course and scope of his employment for Dynamic Air Balancing, Inc., while performing his job duties at a project owned by Trendmaker and controlled by Trendmaker and general contractor Millis.[9] The following is the relevant portion of Gordon's original petition:

> On February 2, 2009, Plaintiff Wayne Gordon, was in the course and scope of his employment for Dynamic Air Balancing, Inc, was performing his job duties at the Cross Creek Ranch Visitors & Recreation Center. The Visitors & Recreation Center was under the control of the developer, Trendmaker Homes, Inc. and/or the general contractor, Millis Development and Construction, Inc. On the day in question, Plaintiff was attempting to climb an attic ladder when he fell.[10]

Gordon initially amended his petition in the Underlying Action five

---

[6] See id.

[7] See id.

[8] See Doc. 21, Ex. 4A to Pls.' Mot. for Partial Summ. J., Gordon's Orig Pet.

[9] See id.

[10] Id.

times, making very similar allegations.[11]

Plaintiff's First Amended Petition

On February 2, 2009, Plaintiff Wayne Gordon, was in the course and scope of his employment for Dynamic Air Balancing Inc., was performing his job duties at the Cross Creek Ranch Fitness Center. The Fitness Center was under the control of the developer, Trendmaker Homes, Inc. and/or the general contractor, Millis Development and Construction, Inc. On the day in question, Plaintiff was attempting to climb an attic ladder when he fell.[12]

Plaintiff's Second Amended Petition

On February 2, 2009, Plaintiff Wayne Gordon, was in the course and scope of his employment for Dynamic Air Balancing, Inc., was performing his job duties at the Cross Creek Ranch Fitness Center. The Fitness Center was under the control of the developer, Trendmaker Homes, Inc. and/or the general contractor, Millis Development and Construction, Inc. On the day in question, Plaintiff was attempting to climb an attic ladder when he fell.[13]

Plaintiff's Third Amended Petition

On February 2, 2009, Plaintiff Wayne Gordon, was in the course and scope of his employment for Dynamic Air Balancing, Inc., was performing his job duties at the Cross Creek Ranch Fitness Center. The fitness center was under the control of the developer, Trendmaker Homes, Inc. and/or the general contractor, Millis Development and Construction, Inc, and/or Insite Architecture, Inc. On the day in question, Plaintiff was attempting to climb an attic ladder when he fell.[14]

Plaintiff's Fourth Amended Petition

On February 2, 2009, Plaintiff Wayne Gordon, was in the course and scope of his employment for Dynamic Air Balancing, Inc., was performing his job duties at the

---

[11]     See Doc. 21, Ex. 4 to Pls.' Mot. for Partial Summ. J., Pleadings in the Underlying Action.

[12]     See Doc. 21, Ex. 4B to Pls.' Mot. for Partial Summ. J., Gordon's 1st Am. Orig Pet.

[13]     See Doc. 21, Ex. 4C to Pls.' Mot. for Partial Summ. J., Gordon's 2d Am. Orig. Pet.

[14]     See Doc. 21, Ex. 4D Pls.' Mot. for Partial Summ. J., Gordon's 3d Am. Orig Pet.

Cross Creek Ranch Fitness Center. The fitness center was under the control of the developer, Trendmaker Homes, Inc. and/or the general contractor, Millis Development and Construction, Inc, and/or Insite Architecture, Inc. On the day in question, Plaintiff was attempting to climb an attic ladder when he fell.[15]

Plaintiff's Fifth Amended Petition

On February 2, 2009, Plaintiff Wayne Gordon, was in the course and scope of his employment for Dynamic Air Balancing, Inc., was performing his job duties at the Cross Creek Ranch Fitness Center. The fitness center was under the control of the developer (Trendmaker Homes, Inc.), the general contractor (Millis Development and Construction, Inc.) and the architect (Insite Architecture Inc.) On the day of his injury, Plaintiff was utilizing an attic ladder that had been specified by Insite, order and installed by Millis Development, and inspected and approved by Trendmaker. Unfortunately, the attic ladder was insufficient for its intend use as it was too short and unstable. The ladder was the only means of ingress/egress into the area. As a result of the negligent acts and omissions of Defendants and the deficiencies that existed with regards to the ladder, Plaintiff fell and sustained severe injuries.[16]

On June 23, 2010, Gordon filed his sixth amended original petition, which, in addition to the same allegations set forth in the first through fifth amended petitions, specifically identified Texas Mechanical Contractors ("TMC") as the party who hired Dynamic Air to do the heating, ventilation, and air conditioning ("HVAC") work at the Fitness Center.[17] The relevant portion of Gordon's sixth amended petition appeared as follows:

On February 2, 2009, Plaintiff Wayne Gordon, was in the course and scope of his employment for Dynamic Air Balancing, Inc., was performing his job duties at the

---

[15]    See Doc. 21, Ex. 4E to Pls.' Mot. for Partial Summ. J., Gordon's 4th Am. Orig Pet.

[16]    See Doc. 21, Ex. 4F to Pls.' Mot. for Partial Summ. J., Gordon's 5th Am. Orig Pet.

[17]    See Doc. 21, Ex. 4G to Pls.' Mot. for Partial Summ. J., Gordon's 6th Am. Orig Pet.

Cross Creek Ranch Fitness Center. The Cross Creek Ranch Fitness Center was part of a development undertaken by Trendmaker. Plaintiff will show onto this Court and jury that Trendmaker contractually retained the Millis Development to serve as the general contractor for the construction project that included the Fitness Center facility where Plaintiff was injured. Millis Development, in turn, contracted with Texas Mechanical Contractors retained Dynamic Air Balancing, Inc. (the employer of Plaintiff) to balance the air-conditioning flow from the units that had been installed by Texas Mechanical Contractors. During this ongoing construction project/process, Trendmaker, Millis and Texas Mechanical Contractors supervised and scheduled the work activities as the construction was not yet completed.

It was during the work in progress that Plaintiff sustained his injuries on the job site.[18]

In each amended petition in the Underlying Action, Gordon averred that he was injured during the course and scope of his employment and while performing his assigned job duties.[19] Specifically, Gordon alleged defective and negligent construction, an unreasonably dangerous property condition, violations of the Texas Deceptive Trade Practices Act, and gross negligence by both Millis and Trendmaker.[20] Gordon's sixth through ninth amended petitions are the only ones that mention TMC.[21] TMC is not a named defendant in any petition.[22] Trendmaker and Millis are named defendants in every amended petition in the Underlying Action.[23]

## B. The America First Policy

_____

[18]     See Doc. 21, Ex. 4G to Pls.' Mot. for Partial Summ. J., Gordon's 6th Am. Orig Pet.

[19]     See Doc. 20, Pls.' 2d Am. Compl., p. 3.

[20]     See id.

[21]     See Doc. 11, Def.'s Mot. for Partial Summ. J., p. 2.

[22]     See Doc. 21, Ex. 4 to Pls.' Mot. for Partial Summ. J., Pleadings in Underlying Action; Doc. 11, Ex.'s C-H to Def.'s Mot. for Partial Summ. J.

[23]     See id.

America First issued policy No. CCP8069882 to TMC ("America First Policy"), which included commercial general liability ("CGL") coverage for the policy period of September 3, 2008, through September 3, 2009.[24]   The America First Policy contained the following provision for additional insured coverage ("Additional Insured Provision"):

> **Who Is An Insured** is amended to include as an insured any person or organization when you and such a person or organization have agreed in writing in a contract, agreement or permit that such person or organization be added as an additional insured on your policy to provide insurance such as afforded under this coverage part. Such person or organization is an additional insured only with respect to liability arising out of (a) Your ongoing operation performed for that person or organization; or (b) Premises or facilities owned or used by you.
>
> With respect to provision 1.a. above, a person's or organization's status as an insured under this endorsement ends when your operations for that person or organization are completed.[25]

The America First Policy also contains an other-insurance provision:

> **4. Other Insurance**
>
> If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
>
> **a. Primary Insurance**
>
> This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other

---

[24]   See Doc. 21, Ex. 2 to Pls.' Mot. for Partial Summ. J., America First Policy Excerpts with Dep. on Written Contract, p. 31.

[25]   See Doc. 11, Ex. A to Def.'s Mot. for Partial Summ. J., p. 3.

insurance by the method described in c. below.[26][27]

. . . .

**c. Method of Sharing**

If all of the other insurance permits contribution by
equal shares, we will follow this method also. Under this
approach each insurer contributes equal amounts until it
has paid its applicable limit of insurance or none of the
loss remains, whichever comes first.

If any of the other insurance does not permit
contribution by equal shares, we will contribute by
limits. Under this method, each insurer's share is based
on the ratio of its applicable limit of insurance to the
total applicable limits of insurance of all insurers.

## C. <u>The Mt. Hawley Policy</u>

Mt. Hawley issued a CGL Policy, No. MGL0152705 ("Mt. Hawley
Policy"), with a policy period of August 15, 2008, through August
15, 2009, to Millis.[28] The Mt. Hawley Policy contained the following
contractual subrogation condition:

8. Transfer of Rights of Recovery Against Others To Us

If the insured has rights to recover all or part of any
payment we have made under this Coverage Part, those
rights are transferred to us. The insured must do nothing
after loss to impair them. At our request, the insured
will bring "suit" or transfer those rights to us and help
us enforce them.

The Mt. Hawley Policy also contained the following other-insurance
provision set forth in the "Amendment of Other Insurance - Excess
Provision (Construction Contacts)" endorsement:

(3) This insurance is excess over any other insurance

---

[26]     Subsection b listed circumstances under which America First would
provide excess coverage, none of which apply to the facts before this court.

[27]     <u>See</u> Doc. 21, Ex. 2 to Pls.' Mot. for Partial Summ. J.,p. 31, America
First Policy Excerpts with Dep. on Written Contract.

[28]     <u>See</u> Doc. 21, Ex. 5 to Pls.' Mot. for Partial Summ. J., Mt. Hawley
Policy.

whether primary, excess, contingent or on any other basis that is available to you as an additional insured or contractual indemnitee under a policy issued to a subcontractor.  You are required to give notice of claim to all "potential insurers" within thirty days of giving notice of claim to us.

We have no duty under **Coverage A** or **B** to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to your rights against all those other insurers.

We will pay only our share of the amount of loss, if any, that exceeds the sum of:

(a) the total amount that all such other insurance would pay for the loss in absence of this insurance; and

(b)  The  total  of  all  deductible  and  self-insurance amounts under all such insurance.

We will share the remaining loss, if any, with any other insurance  that  is  described  in  this  Excess  Insurance provision  and  was  not  bought  specifically  to  apply  in excess  of  the  Limits  of  Insurance  shown  in  the Declarations of this Coverage Part.

"Potential Insurers" means all insurance companies who may be obligated to defend the insured as either a named insured or an additional insured. "Potential insurers" includes  the  insurers  of  all  subcontractors  who  were contractually  obligated  to  name  the  insured  as  an additional insured on their own insurance policy(ies).[29]

## D. **The TMC/Millis Subcontract**

On March 5, 2008, TMC entered into a contract with Millis to perform work at the Cross Creek Ranch Visitors Center ("TMC/Millis Subcontract").[30] Under the TMC/Millis Subcontract, Millis was named the contractor and TMC was named the subcontractor. [31] It also stated that Millis had previously entered into a contract with

---

[29]     See id.

[30]     See Doc. 21, Ex. 1 to Pls.' Mot. for Partial Summ. J., TMC/Millis Subcontract; Doc. 11-2, Ex. B to Defendant's Motion for Partial Summary Judgment.

[31]     See id.

Trendmaker ("Trendmaker/Millis Contract"), dated February 22, 2008, for work to be done at the Cross Creek Ranch Visitors Center, as per the plans and specifications prepared by Insite Architecture, Inc.[32]  The TMC/Millis Subcontract was for HVAC work at the Cross Creek Ranch Visitors Center.[33] It was priced at $154,450.[34]

The TMC/Millis Subcontract listed five attached exhibits, including Exhibit A, and immediately followed the list with this explanation:"[a]ll of which are made a part of said contract and all of which are now made a part of this subcontract."[35] Exhibit A, titled "Subcontractor's Insurance Requirements," provided that TMC was required to obtain a CGL policy and make Millis and Trendmaker additional insureds under that policy.[36]  Exhibit A also stated that TMC's policy would provide primary and non-contributory insurance to Millis and Trendmaker as general contractor and owner of the project, respectively.[37] The TMC/Millis Subcontract was signed by representatives of Millis and TMC.[38]

**F.  History of this Action**

After receiving notice that Gordon had filed his original petition in the Underlying Action, Mt. Hawley made tenders to

---

[32]     Id.

[33]     Id.

[34]     Id.

[35]     See Doc. 21, Ex. 1 to Pls.' Mot. for Partial Summ. J., TMC/Millis Subcontract; Doc. 11-2, Ex. B to Def.'s Mot. for Partial Summ. J.

[36]     Id.

[37]     Id.

[38]     Id.

America First on behalf of Millis and Trendmaker demanding that America First defend and indemnify them against Gordon's claims in the Underlying Action. [39] America First initially denied those tenders in writing on March 24, 2009. [40] On August 6, 2010, America First verbally informed Mt. Hawley's counsel that America First would accept the defense and indemnity responsibility for Millis but not Trendmaker. [41] According to Mt. Hawley, an America First representative stated that a formal acceptance of the tender would be forthcoming.   Mt. Hawley claims that they did not hear from American First, and thereafter brought this declaratory action. [42]

On September 26, 2010, America First sent Mt. Hawley an electronic communication accepting primary coverage responsiblity for Millis in the Underlying Action. [43] The following is the relevant excerpt from that communication:

> We do not dispute that Millis qualifies as an insured under our policy, and that our coverage would be primary, as Millis was the "person or organization" with whom Texas Mechanical had the "agreement in writing to add that person or organization as an additional insured." The issue is that Trendmaker does not qualify, as Texas Mechanical did not have the written agreement in writing with Trendmaker. [44]

On October 13, 2010, America First provided Mt. Hawley with a

---

[39]   See Doc. 20, Pls.' 2d Am. Compl., p. 5, n. 17; Doc. 22, Def.'s Ans. to Pls.' 2d Am. Compl., p. 3, n. 17.

[40]   See id. at n.18; Doc. 21, Ex. 3 to Pls.' Mot. for Partial Summ. J., America First Correspondence Denying Millis's March 9, 2009 Tender.

[41]   See id.

[42]   Id.

[43]   See Doc. 21, Ex. 6-1 to Pls.' Mot. for Partial Summ. J., America First Correspondence.

[44]   See id.

formal acceptance of Mt. Hawley's tender demand for defense and
indemnity of Millis in the Underlying Action.[45]   The relevant
portion of that correspondence appeared as follows:

> [We] do not dispute that Millis qualifies as an insured
> under our policy, and that our coverage would be primary,
> as Millis was the "person or organization" with whom
> Texas Mechanical had the "agreement in writing to add
> that person or organization as an additional insured."
> However, Trendmaker does not qualify as an insured, as
> Texas Mechanical did not have a written agreement in
> writing with Trendmaker.[46]

In that same letter, America First stated that it had retained new
defense counsel for Millis.[47]  America First also requested Millis's
current attorney to provide the new defense counsel with a copy of
the case file.[48]

On November 28, 2010, America First supplemented its October
13, 2010 letter with a letter in which American First again agreed
to provide Millis a defense against the claims asserted in the
Underlying Action subject to a reservation of rights.[49] The letter
maintained that America First's policy coverage for Millis was to
apply on "a primary non-contributing basis with Millis's own CGL
policy issued through Mt. Hawley."[50] The reservation of rights
included in the letter expressed that America First reserved its
right to assert any coverage defenses or exclusions from coverage

---

[45]    See id.

[46]    Id.

[47]    Id.

[48]    Id.

[49]    See Doc. 21, Ex. 6 to Pls.' Mot. for Partial Summ. J., America First
Correspondence.

[50]    Id.

that may arise under the policy for the allegations in the Underlying Action.[51]

Mt. Hawley avers that it did not receive any reports or status updates regarding Millis's defense in the Underlying Action from the new defense counsel after it assumed representation.   [52]   On January 18, 2011, Mt. Hawley requested information regarding any settlement demands and mediation proceedings that could implicate Mt. Hawley's excess coverage.[53]   On January 21, 2011, America First's defense counsel responded that mediation was set for February 14, 2001, and requested that the two insurers try to resolve some of the coverage issues so that mediation would not fall apart.[54]

Then, on February 7, 2011, America First served its Motion for Partial Summary Judgment (Doc. 11) in this case on Mt. Hawley.   [55] According to Mt. Hawley, this was the first time that America First notified Mt. Hawley that it expected Mt. Hawley to share defense and indemnity costs for Millis, and that America First no longer considered its coverage primary and non-contributory.[56] In an e-mail dated February 11, 2011, Mt. Hawley expressed its disagreement with

---

[51]   Id.

[52]   See Doc. 20, Pls.' 2d Am. Compl., p. 7, n. 25; but see Doc. 22, Def.'s Ans. to Pls.' 2d Am. Compl., p. 4, n. 25 ("America First is without sufficient knowledge to admit or deny the allegations in paragraph 25").

[53]   See id.

[54]   See Doc. 13-1, Ex. A to Def.'s Resp. to Pl.'s Mot. for Leave to File 2d Am. Compl., E-mail from Todd Lonergan to Greg Winslet, January 21, 2011.

[55]   See Doc. 13-2, Ex. B to Def.'s Resp. to Pl.'s Mot. for Leave to File 2d Am. Compl., E-mail from Todd Lonergan to Greg Winslet, February 7, 2011.

[56]   See Doc. 20, Pls.' 2d Am. Compl, p. 7, n. 26.

America First's current position on coverage, and stated that it would attempt to settle on behalf of Trendmaker, but would not spend any money on behalf Millis until American First had exhausted its $1,000,000 policy limit.[57]

## II. Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003). The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).

A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th

---

[57]    See Doc. 13-3, Ex. C. to Def.'s Resp. to Pl.'s Mot. for Leave to File 2d Am. Compl., E-mail from Greg Winslet to Todd Lonergan, February 11, 2011.

Cir. 2002).

### III.  Analysis

As this declaratory action is in federal court under diversity jurisdiction, state law governs substantive matters.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938).  Because Texas is the forum state in this matter, the court applies Texas' choice of law rules. See Guar. Nat'l Ins. Co. v. Azrock Indus., 211 F.3d 239, 243 (5th Cir. 2000)(citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (stating that a federal district court sitting in diversity must apply the forum state's conflict of laws rules)). Any insurance policy payable to a "citizen or inhabitant" of Texas by an insurance company doing business in Texas is held to be governed by Texas law regardless of where the contract was executed or to where the premiums are paid.  Tex. Ins. Code art. 21.42.  By relying on Texas law in their briefs, the parties have conceded that Texas law applies to the interpretation of the insurance policies.

Pending before the court on summary judgment are four disputed issues. First, whether Trendmaker qualifies as an additional insured on the America First Policy. Second, when, or at what point, in the Underlying Action did America First's duty to defend begin. Third, how, or in what manner, should liability and costs be apportioned between Mt. Hawley and America First. And, finally, whether Mt. Hawley is entitled to recover from America First the costs Mt. Hawley has expended in defending and indemnifying Millis and Trendmaker in the Underlying Action.

A.    **Whether Trendmaker is an Additional Insured Under the**
      **America First Policy**

In its motion for partial summary judgment, Plaintiff asks the
court to declare that Trendmaker is an additional insured on the
America First Policy and that, therefore, America First had a duty
to defend Trendmaker in the Underlying Action. Defendant argues in
its motion for partial summary judgment that it owes no duty to
defend Trendmaker and that Trendmaker is not an additional insured
under the America First Policy because there is no "direct
contract" between TMC and Trendmaker making Trendmaker an
additional insured under the America First Policy.

When construing insurance policies, the court uses the same
rules of construction that apply to construing a contract
generally. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v.
Crocker, 246 S.W.3d 603, 603 (Tex. 2008); State Farm Life Ins. Co.
v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995). The court's primary
concern is enforcing the parties' expressed intent. See Forbau v.
Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994). This means
that the terms in an insurance contract will be given their
ordinary meaning unless the policy shows that the words were meant
in a technical or different sense. Gonzalez v. Mission Am. Ins.
Co., 795 S.W.2d 734, 736 (Tex. 1990); Sec. Mut. Cas. Co. v.
Johnson, 584 S.W.2d 703, 704 (Tex. 1979).

The America First Policy provides that a party will be
considered an additional insured "when you [TMC] and such a person
or organization [Mills or Trendmaker] have agreed in writing in a
contract, agreement, or permit" that such a person or organization

16

be added as an additional insured on the policy.  In other words, in order for a party to be considered an additional insured under the America First Policy, there must be a written contract in which both TMC and that party have agreed that the party would be added as an additional insured on the America First Policy. There is no dispute between the parties that such an agreement exists between TMC and Millis, and that, therefore, Millis is an additional insured under the America First Policy.

The parties diverge, however, on the issue of whether Trendmaker is an additional insured under the America First Policy. Defendant argues that the language of the Additional Insured Provision of the America First Policy mandates a direct contract between TMC and any party it wishes to add as an additional insured.  Based on the evidence provided by both parties at summary judgment, there is no written contract directly and explicitly between TMC and Trendmaker in which TMC agrees to make Trendmaker an additional insured under its America First Policy.

That being said, although a direct contract would satisfy the Additional Insured Provision, a direct contract is not necessarily required by the plain language of the policy.  Texas case law is clear that the court must interpret the language of the policy as it is written and must strictly construe it in an attempt to give the language its literal reading. National Union Fire Ins. Co., 246 S.W.3d at 605. Contrary to Defendant's position, a straightforward, literal reading of the America First Policy does not require a direct contract to exist between TMC and Trendmaker in order for Trendmaker to be an additional insured under the policy.  All that

is required is a written contract in which both TMC and Trendmaker have agreed that Trendmaker would be added as an additional insured on the America First policy.  This is clear from the language of the policy itself.

First, the actual wording of the Additional Insured Provision does not include the words "direct" or "between" in reference to the written contract. Nor are the words "have agreed" followed by the words "with each other" or "together". To add in those words would require the court to narrow the scope of coverage within the policy, and the court may not interpret the policy in a way that gives new meaning to the terms of the policy. See Nat'l Union Fire Ins. Co., 246 S.W.3d at 606 (explaining that the court must give the policy's words their plain meaning, without inserting additional provisions into the contract).

Furthermore, the Additional Insured Provision does not require that both parties be signers of the written contract in order for one of the parties to be considered an additional insured. It only requires that both parties agree in a written contract that one of the parties is to be an additional insured.

Moreover, while it is clear that a direct contract would meet the requirements of the Additional Insured Provision, it is also clear that both parties could agree that Trendmaker would be added as an additional insured, and that both parties' agreements could be memorialized in writing, in the same contract, without the parties being in a direct contract with each other. And while a scenario such as this may seem unlikely at first blush, the present case is perhaps the perfect example of when there can be such an

agreement without a direct contract between the parties.

In the TMC/Millis Subcontract, TMC agreed to make Trendmaker an additional insured under its America First policy.  In the Trendmaker/Millis Contract, Trendmaker agreed to be an additional insured on the CGL policy of any party subcontracted by Millis pursuant to the Trendmaker/Millis Contract. The TMC/Millis Subcontract was made pursuant to the Trendmaker/Millis Contract, incorporating, through Ex. A, Trendmaker's agreement that it be added as an additional insured. Therefore, the TMC/Millis Subcontract is a contract in which both TMC and Trendmaker have agreed in writing that Trendmaker should be added as an additional insured in the America First Policy.[58]

No Texas court has interpreted this precise provision under the same circumstances. Defendant encourages the court to look outside Texas for guidance. The case Defendant cites is a state trial court opinion from New York. See Brooklyn Hosp. Ctr. v. OneBeacon Ins., 799 N.Y.S.2d 158 (N.Y. Sup. Ct. 2004).

In Brooklyn Hospital Center, the court held that an insurer was not required to extend coverage to the hospital insofar as there was no written agreement specifically between the insured and the hospital requiring the hospital to be named as an additional insured. Id. at 161. In that case, the insured was the employer of the injured party in the underlying lawsuit. Id. The insured had subcontracted work from the hospital's manager and had a provision in its subcontract that required it to add the hospital and the

---

[58]     The court recognizes that this approach to construing the America First Policy may be seen as "splitting hairs," but that is precisely the job of a court in interpreting insurance policies and determining coverage.

hospital's manager as additional insureds under its CGL policy. Id. The policy issued to the insured included as insureds, "any person or organization for whom [the insured] is performing operations when [the insured] and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured." Id. While the court found that hospital's manager was an additional insured because there was a direct contract between the insured and the manager, the court held that the hospital was not an additional insured because there was no direct contract between the insured and the hospital. Id.

Besides the obvious difference that the New York case did not apply Texas law, the court rejects the notion that plain meaning can be derived from a policy provision by adding words and requirements that limit coverage. The New York court altered the meaning and scope of the additional insured provision by adding the word "between" and interpreting the use of the word "such" as requiring a direct contract. See Brooklyn Hosp. Ctr., 799 N.Y.S.2d at 158-161. The court ignored the possibility that in a case such as this, the two parties can each agree to something, which is then memorialized in writing in a contract with only one of the parties being a signer or party to that contract or agreement. The New York court did not explain its rationale for adding the words "direct" and "between" into the additional insured provision. However, in the present case, the court is not inclined to follow the cited, non-binding opinion because it would improperly restrict coverage.[59]

---

[59]    The court found on its own an Illinois appellate court opinion that interpreted the same provision as requiring a direct contract between the parties. See Westfield Insurance Co. v. FCL Builders Inc., 948 N.E.2d 115 (Ill.

To be clear, the court is not saying that the Additional
Insured Provision of the America First Policy is ambiguous or that
there is more than one reasonable interpretation of the policy.
Under Texas law, if the terms in a contract can be given a definite
or certain legal meaning, they are not ambiguous, and the court
will construe the contract as a matter of law. Fiess v. State Farm
Lloyds, 202 S.W.3d 744, 746 (Tex. 2006). Not every difference in
the interpretation of a contract creates an ambiguity. See Forbau,
876 S.W.2d at 134. More importantly, the mere disagreement over the
meaning of a particular provision in a contract does not make it
ambiguous. Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d
462, 465 (Tex. 1998).  In order for an ambiguity to exist when the
parties advance conflicting interpretations, both interpretations
must be reasonable. See Columbia Gas Transmission Corp. v. New Ulm
Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996).

The court finds that the language of the Additional Insured
Provision of the America First Policy can only engender one
reasonable meaning. That is, in order for a party to become an
additional insured under the America First Policy, TMC and that
party must have agreed in writing in a contract, agreement or
permit that the party will be added as an additional insured.[60] In
the present case, both TMC and Trendmaker agreed that Trendmaker

---

App. Ct. 2011). The Illinois appellate court's explanation for requiring a direct
contract is unconvincing to this court for the same reasons as the New York case.

[60]     The court notes that both parties' applications of the Additional
Insured Provision are in a sense correct. A direct contract between TMC and
Trendmaker would satisfy the requirements of the policy, but so does a single
contract incorporating separate written agreements. Adding words into the
language of the policy and reducing the scope of coverage hardly seems like a
reasonable interpretation of the policy.

would be added as an additional insured under the America First Policy. Both parties have put their agreements in writing, and their agreements were expressed in a contract. Therefore, under the plainest reading of the Additional Insured Provision, Trendmaker qualifies as an additional insured under the America First Policy.[61]

**B.   <u>America First's Duty to Defend Millis and Trendmaker</u>**

In the present case, there is no dispute between the parties that America First has a duty to defend Millis in the Underlying Action. Defendant claims, however, that its duty to defend Millis and Trendmaker in the Underlying Action did not begin until Gordon filed his sixth amended petition in the Underlying Action. Plaintiff argues, conversely, that America First's duty to defend was triggered with the filing of the original petition in the Underlying Action.

Under Texas law, an insurer's duty to defend is determined by the eight-corners rule, which holds that an insurer's duty to defend its insured arises if the complaint in the suit against the insured alleges facts that potentially support claims for which there is coverage. <u>Trinity Universal Ins. Co. v. Cowan</u>, 945 S.W.2d

---

[61]    As an aside, the court notes that its reading of the Additional Insured Provision is also correct as a matter of policy.  As the court understands the construction industry, it is the normal course of business to have an arrangement such as this where the owner of a project hires a general contractor who then hires a subcontractor on behalf of the owner. To require a "direct contract" between subcontractor and owner in the present case would disrupt usual business practices and create problems for owners, contractors, subcontractors, and insurance companies doing business in the industry. Clearly, in this case, TMC, Millis and Trendmaker all intended for Trendmaker to have coverage under the America First Policy. America First is now trying to avoid its coverage duties by making an argument that changes the meaning of the policy and substantially narrows the scope of coverage.

819, 821-22 (Tex. 1997); <u>Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs Fast Motor Lines, Inc.</u>, 939 S.W.2d 139, 141 (Tex. 1997). In determining whether this duty exists, the court's only job is to compare the four corners of the pleading with the four corners of the insurance policy. <u>Lincoln Gen. Ins. Co. v. Reyna</u>, 401 F.3d 347, 350 (5th Cir. 2005).

When applying the eight-corners rule, the court considers the factual allegations without regard to their truth or falsity. <u>GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church</u>, 197 S.W.3d 305, 310 (Tex. 2006). The court interprets the allegations liberally and resolves all doubts regarding the duty to defend in favor of the insured. <u>Merchs. Fast Motor Lines, Inc.</u>, 939 S.W.2d at 141. Courts may generally not, however, (1) read facts into the pleadings, (2) look outside the pleadings, or (3) imagine factual scenarios which might trigger coverage. <u>Guar. Nat'l Ins. Co. v. Azrock Indus.</u>, 211 F.3d 239, 243 (5th Cir.2000); <u>see also</u> <u>Fielder Rd. Baptist Church</u>, 197 S.W.3d at 311. The court may draw inferences from the petition that may lead to a finding of coverage. <u>Gen. Star Indem. Co. v. Gulf Coast Marine Assocs.</u>, 252 S.W.3d 450, 456 (Tex.App.-Houston [14th Dist.] 2008, pet. denied). And it is the factual allegations, not the legal theories, that control. <u>Fed. Ins. Co. v. Ace Prop. & Cas. Co.</u>, 429 F.3d 120, 125 (5th Cir.2005) (citing <u>Merchs. Fast Motor Lines, Inc.</u>, 939 S.W.2d at 141).

So long as the underlying suit alleges facts that may fall within the scope of coverage, the insurer has a duty to defend. <u>See Northfield Ins. Co. v. Loving Home Care</u>, 363 F.3d 523, 528 (5th Cir.

23

2004); Merchs. Fast Motor Lines, Inc., 939 S.W.2d at 141.
Conversely, if the underlying suit does not allege facts within the
scope of policy coverage, an insurer has no duty to defend. See
Merchs. Fast Motor Lines, Inc., 939 S.W.2d at 141.

In the present, case the America First Policy is not ambiguous
and can be assigned meaning as a matter of law. See Nat'l Union
Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus, 907 S.W.2d 517, 520
(Tex. 1995). The policy provides coverage for an additional insured
"only with respect to liability arising out of the insured's [TMC]
ongoing operations performed for that person or organization", or
liability arising out of "the premises or facilities owned or used
by the insured [TMC]."[62]  Therefore, America First's duty to defend
Millis and Trendmaker in the underlying action began when Gordon
alleged some sort of injury arising out of TMC's ongoing operations
performed for Millis and Trendmaker, or arising out of the premises
or facilities owned or used by TMC.

In his original petition, Gordon alleged that he was injured
while performing his duties at the Cross Creek Ranch Visitors &
Recreation Center and that he was acting in the course and scope of
his employment for Dynamic Air Balancing, Inc.  He also alleged
that the Visitor's and Recreation Center was under control of the
developer, Trendmaker and/or the general contractor, Millis. Gordon
claimed that his injuries were the result of Millis and
Trendmaker's negligence, and that, therefore, he was entitled to

---

[62]    See Doc. 21, Ex. 2 to Pls.' Mot. for Partial Summ. J., America First
Policy Excerpts with Dep. on Written Contract, p. 31.

damages.   TMC was not mentioned by name anywhere in the original petition.

Defendant claims that there are no allegations in the original petition that would even suggest that Gordon's injury was in a manner related to the work subcontracted by TMC. Defendant argues that Plaintiff cannot show the connection between the alleged injury and TMC without using extrinsic evidence. Defendant asserts that under Texas law, the court cannot use extrinsic evidence to establish that Gordon's injury arose out of TMC's operations and thereby entitle Millis to additional insured coverage under the America First Policy.

Conversely, Plaintiff argues that the original petition and every amended petition thereafter sufficiently alleges liability that potentially falls within the broad "arising out of" language found in the America First Additional Insured Provision. First, Plaintiff contends that, in the insurance context under Texas law, an injury arises out of an operation if the operation simply brings the person to the premises for the purposes of that operation. Second, Plaintiff argues that Texas law does not require a specific allegation of fault by TMC and that there is no requirement of an attribution of fault between the insured, TMC, and additional insured, Millis. Third, Plaintiff argues that the petition does not need to specifically identify the named insured to trigger coverage for an additional insured.   And finally, Plaintiff argues that extrinsic evidence of TMC's subcontractor relationship with Dynamic

Air Balancing establishes America First's duty to defend Millis as of the date of Plaintiff's Original Petition.

Ordinarily, as Defendant correctly notes, the court will not consider facts outside the pleadings. See Liberty Mut. Ins. Co v. Graham, 473 F.3d 596, 600 (5th Cir. 2006). The Supreme Court of Texas has never expressly recognized an exception to the eight-corners rule, however, it has acknowledged that other courts have drawn a "very narrow exception" allowing extrinsic evidence "only when relevant to an independent and discrete coverage issue, not touching on the merits of the underlying third-party claim." Fielder Rd. Baptist Church, 197 S.W.3d at 308; see also Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co., 279 S.W.3d 650, 654 (Tex. 2009).

In Fielder Road Baptist Church, the court resolved the case before it without expressly approving of this exception because the extrinsic evidence in that case was relevant to both coverage and the merits, so the exception did not apply. 197 S.W.3d at 309. However, the court noted the Fifth Circuit's observation that, if the Supreme Court of Texas were to recognize an exception to the eight-corners rule, it would likely do so only under circumstances where "it is initially impossible to discern whether coverage is potentially implicated and when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case." Id. at 308-09 (emphasis in original) (citing

26

<u>Northfield Ins. Co. v. Loving Home Care, Inc.</u>, 363 F.3d 523, 531 (5th Cir. 2004)).

Indeed, almost every intermediate Texas court decision allowing extrinsic evidence to establish the duty to defend has permitted extrinsic evidence on the basis that the original petition did not allege facts sufficient to determine if coverage exists. <u>See e.g.</u> <u>Int'l Serv. Ins. Co. v. Boll</u>, 392 S.W.2d 158, 161 (Tex. Civ. App.--Houston 1965, writ ref'd n.r.e.). For example, in <u>Western Heritage Insurance Co. v. River Entertainment</u>, the court stated, "[W]hen the petition does not contain sufficient facts to enable the court to determine if coverage exists, it is proper to look to extrinsic evidence in order to adequately address the issue." 998 F.2d 311, 313 (5th Cir. 1993). In <u>State Farm Fire & Casualty Co. v. Wade</u>, the court explained that extrinsic evidence could be admitted in deciding the duty to defend when the facts alleged in the original petition are insufficient to determine coverage and "when doing so does not question the truth or falsity of any facts alleged in the underlying petition." 827 S.W.2d 448, 452-53 (Tex. App.-- Corpus Christi 1992, writ denied). Moreover, in <u>Gonzales v. American States Insurance Co.</u>, the court held that facts extrinsic to the petition relating only to coverage, not liability, may be considered to determine a duty to defend, where such evidence does not contradict any allegation in the petition. 628 S.W.2d 184, 187 (Tex. App.--Corpus Christi 1982, no writ).

In applying the eight-corners rule to the present case, the

court cannot discern from the face of Gordon's original petition in the Underlying Action whether Gordon's allegations arose out of TMC's ongoing operations under the TMC/Millis subcontract. And, although a very significant issue for the case before this court, the relationship between Dynamic Air, TMC, and Millis is not relevant to the merits of the Underlying Action. Based on the facts alleged, it is impossible to determine whether Millis is afforded coverage under the America First Policy for defense against Gordon's allegations. Gordon's original petition only alleged that Millis and Trendmaker were responsible for his alleged injuries and that he was injured while acting within the scope of his employment for Dynamic Air.   There is no explanation or indication of how Dynamic Air was associated with Millis or Trendmaker, and it is impossible to tell whether Gordon's claims against Millis and Trendmaker fall within coverage under the America First Policy.

As previously explained, the Texas Supreme Court has implicitly acknowledged, if not officially recognized, that, in cases such as this, where it is impossible to discern whether coverage is potentially implicated and evidence is available that goes solely to the issue of coverage without contradicting any fact alleged in the underlying pleading, the narrow exception to the eight-corners rule applies. See Fielder Rd. Baptist Church, 197 S.W.3d at 308-09. Because the underlying petition is silent as to the relationship between Dynamic Air and Millis, facts indicating that Trendmaker hired Millis, that Millis then subcontracted TMC, and that TMC in turn subcontracted Dynamic Air, do not contradict

the pleadings and, therefore, may be considered as extrinsic evidence within the very limited exception to eight-corners rule.

It is clear from the TMC/Millis Subcontract that Millis contracted TMC to do HVAC work at the Cross Creek Visitors Ranch. Both parties agree that TMC was to perform the HVAC work specifically at the Cross Creek Ranch Fitness Center.  It is also clear from the facts provided by both parties that TMC hired Dynamic Air to do HVAC work at the Cross Creek Visitors Ranch. These facts, while absent from the Gordon's original petition, are essential to determining America First's duty to defend.  More importantly, these facts are readily ascertainable; they do not change or alter any of the facts alleged in the Gordon's original petition; and they do not affect or speak to the merits of Gordon's claims.

Defendant argues that the present case is similar to Pine Oak Builders, where the Texas Supreme Court refused to consider extrinsic evidence that would show that the work, which was the basis of the underlying action, was performed by a subcontractor rather than the named defendants. The extrinsic evidence would have brought the allegations within the coverage of the subcontractor's insurance policy. 279 S.W.3d at 654. The court refused to consider the extrinsic evidence because it would have changed the facts as alleged in the underlying lawsuit and shifted liability from the contractor to the subcontractor. Id. Thus, the extrinsic evidence would have affected the merits of the underlying claim. Id. Conversely, in the present case, the extrinsic evidence considered would only address the issue of coverage and would have no bearing

on the outcome of the case or the distribution of liability among the parties.

Furthermore, even though under a strict formulation of the eight-corners rule the court should only consider what could have been known at the filing of the original petition, in the present case, the court has the fortunate ability to look at Gordon's sixth amended petition and see that the very facts available through extrinsic evidence in his original petition have no effect on the merits of those allegations and that they truly only address the issue of coverage.

Because the facts alleged in Gordon's original petition, combined with readily ascertainable facts going solely to the issue of coverage, present a claim that is potentially within coverage under the America First Policy, the court finds that America First's duty to defend Millis and Trendmaker began with the filing of the original petition in the Underlying Action. See Northfield Ins. Co., 363 F.3d at 528; (explaining that under Texas Law, so long as the underlying suit alleges facts that may fall within the scope of coverage, the insurer has a duty to defend); Amerisure Ins. Co. v. Navigators Ins. Co., 611 F.3d 299, 309 (5th Cir. 2010) ("The court resolves all doubts regarding coverage in favor of coverage.") (citations omitted).

**C.   Apportionment of Defense Costs Between America First and Mt. Hawley.**

In its third issue before the court, Defendant argues that the defense costs incurred in the defense of Millis and Trendmaker in the Underlying Action and any duty to indemnify Millis and

Trendmaker should be apportioned between Mt. Hawley and America First on a pro rata basis.  Defendant claims that the other-insurance provisions in the Mt. Hawley Policy and the America First Policy conflict and that, therefore, they must be disregarded. Plaintiff agrees that defense costs for Trendmaker should be apportioned between Mt. Hawley and America First on a pro rata basis.  Plaintiff, however, argues that America First has primary, non-contributory coverage for Millis and that the Mt. Hawley Policy is excess to the America First Policy in providing coverage for the Underlying Action.[63]

It is undisputed that Millis is insured under both the Mt. Hawley Policy and the America First Policy. It is also undisputed that either policy would provide primary, non-contributory coverage in the absence of the other policy. Both policies however contain differing other-insurance provisions.

The America First Policy contained the following other-insurance provision:

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in c. below [indicating pro rata].

---

[63]    Because both parties agree that America First and Mt. Hawley provide pro-rata coverage for Trendmaker, the court only addresses the other-insurance provisions as they relate to Millis.

The Mt. Hawley Policy contained the following other-insurance provision set forth in the "Amendment of Other Insurance - Excess Provision (Construction Contacts)" endorsement:

> (3) This insurance is excess over any other insurance whether primary, excess, contingent or on any other basis that is available to you as an additional insured or contractual indemnitee under a policy issued to a subcontractor.  You are required to give notice of claim to all "potential insurers" within thirty days of giving notice of claim to us.
>
> We have no duty under **Coverage A** or **B** to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to your rights against all those other insurers.
>
> We will pay only our share of the amount of loss, if any, that exceeds the sum of:
>
> (a) the total amount that all such other insurance would pay for the loss in absence of this insurance; and
>
> (b) The total of all deductible and self-insurance amounts under all such insurance.
>
> We will share the remaining loss, if any, with any other insurance that is described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance show in the Declarations of this Coverage Part.
>
> "Potential Insurers" means all insurance companies who may be obligated to defend the insured as either a named insured or an additional insured. "Potential insurers" includes the insurers of all subcontractors who were contractually obligated to name the insured as an additional insured on their own insurance policy(ies).

When interpreting the relationship between two other-insurance provisions, for many years, Texas' courts have followed the Texas Supreme Court's decision in <u>Hardware Dealers Mutual Fire Ins. Co. v. Farmers Ins. Exch.</u> (hereinafter "<u>Hardware Dealers</u>"), 444 S.W.2d 583 (Tex. 1969). In <u>Hardware Dealers</u>, the court announced the following rule of interpretation:

> When, from the point of view of the insured, she has
> coverage from either one of two policies but for the
> other, and each contains a provision which is reasonably
> subject to a construction that it conflicts with a
> provision in the other concurrent insurance, there is a
> conflict in the provisions.

Id. at 589. After finding that the two policies were reasonably subject to conflicting constructions, the court concluded that it should disregard the conflicting provisions and apportion liability between both insurers on a pro rata basis. Id. at 590.

Hardware Dealers thus created a two-step inquiry to discover whether two other-insurance provisions actually conflict. In conducting the test, the court must first look at the coverage provided by each policy as if that policy were the only policy. The court must consider whether "from the point of view of the insured, she has coverage from either of the two policies but for the other." 444 S.W.2d at 589. Second, the court must evaluate the impact that the two other-insurance provisions would have when read together on the coverage of the insured, and whether "each contains a provision which is reasonably subject to a construction that it conflicts with a provision in the other concurrent insurance." Id. If the answer is yes to both steps, then the policies conflict and coverage should be apportioned on a pro rata basis between the insurers. Id.

A few years ago, the Fifth Circuit had the opportunity to apply the Hardware Dealers test in Royal Insurance Co. of America v. Hartford Underwrites Insurance Co., 391 F.3d 639, 644 (5th Cir. 2004). In Royal Insurance Co., the Fifth Circuit found that the two other-insurance clauses in dispute could reasonably be read to

conflict even though the plain language of the policies could also be read as not conflicting. Royal Ins. Co., 391 F.3d at 644. The Fifth Circuit explained that from the viewpoint of the insured, full coverage was available from either policy absent the existence of the other and that, therefore, the substantive step of the Hardware Dealers test applied and both insurers were liable for their proportional share of coverage. Id.

In the present case, the Mt. Hawley Policy and the America First Policy, respectively, provide primary insurance coverage to Millis and each would provide Millis with full coverage for defense against the claims in the Underlying Action absent the existence of the other policy. Therefore, from the viewpoint of the insured, Millis, full coverage would be available from either policy absent the existence of the other. Because the court does not find this case distinguishable from Royal Insurance, the court holds that the Mt. Hawley and America First other-insurance provisions conflict and that costs of defense and indemnification of Millis in the Underlying Action should be apportioned between Mt. Hawley and America First on a pro rata basis. See id.; see also Willbros RPI, Inc. v. Continental Cas. Co., 601 F.3d 306, 313 (5th Cir. 2010)(affirming that Royal Insurance is controlling and finding that two other-insurance clauses, nearly identical to the ones at issue here, were in conflict notwithstanding the fact that a plain language reading of the policies would not have left the insured without coverage).

D.   **Breach of Contract: Contractual and Equitable Subrogation**

Plaintiff requests that the court declare that America First

owes Mt. Hawley its pro rata portion of the defense and indemnity costs incurred by Mt. Hawley on behalf of Trendmaker and Millis in the Underlying Action. Defendant argues that the Texas Supreme Court's decision in <u>Mid-Continent Insurance Co. v. Liberty Mutual Insurance Co.</u> ("<u>Mid-Continent</u>"), bars Mt. Hawley from recovering from America First under a theory of subrogation because Millis and Trendmaker have already been paid. 236 S.W.3d 765 (Tex. 2007) Defendant claims that because Millis and Trendmaker have already been reimbursed, they have no right to pursue America First, and, therefore, there is nothing to subrogate. Thus, Mt. Hawley has no cause of action under either a contractual or equitable subrogation theory.

Under Texas law, contractual subrogation rights are created between parties by agreement or contract granting the right to pursue reimbursement from a third party in exchange for payment of a loss. <u>Mid-Continent</u>, 236 S.W.3d at 744. When the insurer seeks to recover through contractual subrogation, it "stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defense held by the third party against the insured." <u>Id.</u>

<u>Mid-Continent</u> involved a dispute between two primary insurers who each provided the same insured with a policy containing $1,000,000 liability limits and other standard provisions. One of the insurers also provided additional coverage under $10,000,000 excess policy. The two insurers admitted coverage and cooperatively assumed defense of a lawsuit against their common insured. One of the insurers reached a settlement agreement for $1,500,000 and

demanded that the other insurer contribute its proportionate part. The other insurer, however, only valued the case at $300,000 and refused to contribute more than $150,000.  When the case finally settled, the first insurer paid $1,350,000, while the other paid $150,000.  Under theories of direct contribution and contractual and/or equitable subrogation, the first insurer sued the other insurer seeking to recover the other insurer's pro rata portion of the settlement.

The Texas Supreme Court held that the first insurer could not recover against the other insurer under theories of contractual or equitable subrogation. Id., at 774.  The court explained that the insured had been fully indemnified against his loss, and, therefore, had no contractual right to recover an additional pro rata portion of the settlement from the other insurer.  The court held that the first insurer, standing in the shoes of the insured, likewise had no contractual rights against the other insurer that it could assert in subrogation.

However, in subsequent cases, the Fifth Circuit has restricted the scope of Mid-Continent to apply only to the specific facts of that case. See Colony Ins. Co. v. Peachtree Construction Co., No. 09-11106, 2011 WL 2811523, at *7-9 (5th Cir. July 19, 2011) (noting the court's view that a broad reading of Mid-Continent was at odds with foundational principles of Texas insurance law, as well as in conflict with later decisions of the Texas Supreme Court). In Trinity Universal Insurance Co. v. Employers Mutual Casualty Co., the Fifth Circuit made it clear that Mid-Continent does not address the recovery of defense costs from a co-insurer

who violates its duty to defend a common insured. 592 F.3d 687 (5th Cir. 2010).

Furthermore, in <u>Amerisure Insurance Co. v. Navigators Insurance Co.</u>, the Fifth Circuit rejected an overly broad view of <u>Mid-Continent's</u> subrogation exclusion and held that <u>Mid-Continent</u> does not bar contractual subrogation simply because the insured has been fully indemnified. 611 F.3d 299, 305-07 (5th Cir. 2010); <u>see also</u> <u>Maryland Cas. Co. v. Acceptance Indem. Ins. Co.</u>, 639 F.3d 701 (5th Cir. 2011). More importantly for the purposes of this case, the Fifth Circuit also held in <u>Amerisure</u> that <u>Mid-Continent</u> does not apply to bar contractual subrogation where an insurer has denied coverage. <u>Amerisure Ins. Co.</u>, 611, F.3d at 307.

In the present case, America First denied coverage entirely as to Trendmaker and at least initially and in part as to Millis. Because of America First's denial of coverage, <u>Mid-Continent</u> does not apply to bar Mt. Hawley's recovery under a theory of subrogation for America First's pro rata share of the defense and indemnity costs. Mt. Hawley's Insurance policy created a right of contractual subrogation. And based on the court's analysis of the other-insurance clauses, the court finds that <u>Trinity</u> and <u>Amerisure</u> operate to allow Mt. Hawley's contractual subrogation claim. Therefore, Mt. Hawley is entitled to reimbursement from America First under a theory of contractual subrogation for the amounts it has paid over its pro rata share of the defense or indemnity costs for Millis and Trendmaker in the Underlying Action.[64]

---

[64]     The court does not address Plaintiff's equitable subrogation claim because the court finds that Plaintiff has a right to contractual subrogation. <u>See</u> <u>Amerisure Ins. Co. v. Navigators Ins. Co.</u>, 611 F.3d 299 (5th Cir. 2010);

To the extent that plaintiffs are seeking summary judgment on their remaining breach of contract claims, they have failed to show as a matter of undisputed fact and law that they are so entitled.

## IV.   Conclusion

Based on the foregoing, the court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment, and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Partial Summary Judgment. Because the court has not resolved all of the contract issues in this case, the court **DENIES** any request for attorney's fees at this time.

The court **RECOMMENDS** to the parties that they pursue alternative dispute resolution before expending further resources on the remaining issues.

**SIGNED** in Houston, Texas, this 12th day of May, 2011.

Nancy K. Johnson
United States Magistrate Judge

---

citing Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co., 298 S.W.3d 216, 225 (Tex.App.-San Antonio 2009, pet. denied).